802 F.2d 746
 41 Fair Empl.Prac.Cas. 1665,
41 Empl. Prac. Dec. P 36,491
Alvin WARREN and Alfred Warren, Appellants,
v.
HALSTEAD INDUSTRIES, INC., Appellee,
and
Chauffeurs, Teamsters and Helpers Local Union No. 391,
affiliated with the International Brotherhood of
Teamsters, Chauffeurs, Warehouseman and
Helpers of America, Defendants.
 No. 85-1575.
 United States Court of Appeals,
Fourth Circuit.
 Argued Dec. 2, 1985.
Decided Oct. 2, 1986.
 
 Harvey L. Kennedy and Harold L. Kennedy, III, Winston-Salem, N.C., for appellants.
 James B. Spears, Jr. and Thomas A. Bright, Greenville, S.C., for appellee.
 Before WINTER, Chief Judge, MURNAGHAN, Circuit Judge, and LUTHER M. SWYGERT, Senior United States Circuit Judge for the Seventh Circuit, sitting by designation.
 SWYGERT, Senior Circuit Judge.
 
 
 1
 This case concerns an action charging employment discrimination based on race in violation of Title VII and section 1981. Plaintiffs allege that their discharge from employment was in retaliation for filing administrative charges of discrimination with the Equal Employment Opportunity Commission or for complaining to management of Halstead Industries, Inc., their employer, about racial discrimination in promotions. Upon our review of the record, we affirm in part and reverse in part and remand the case to the district court for further proceedings consistent with this opinion.
 
 
 2
 * The facts in this case are heavily contested. The serious allegations made by the plaintiffs are generally denied by the defendants; the district court based much of its decision on credibility and discounted key testimony of both plaintiffs. Our first task, therefore, is to review the voluminous record and to glean the facts from the conflicting versions.
 
 
 3
 There is no dispute that on June 12, 1978 the plaintiff-brothers, Alfred and Alvin Warren, were hired by Halstead Industries, Inc. ("Halstead") located in Pine Hall, North Carolina. The two black men sought employment following several years of college study. Both plaintiffs and their family members were active in Stokes County, North Carolina politics.
 
 
 4
 The Halstead factory manufactured copper tubing; it was a new plant, having been constructed in December 1977. During the first years of operation, the number of black employees was low (fourteen black employees out of 95 in 1977; seventeen blacks out of 190 in 1978; 56 blacks out of 372 in 1979). The original supervisors were white employees who moved to Pine Hall from two other Halstead plants. It is contested whether any black foremen or supervisors were employed in the plant as a whole or in Halstead's production department ("the B-Bay") from 1977 to 1979.[1]
 
 
 5
 As an additional factor, Halstead's Pine Hall plant was in flux because a union membership drive for the International Brotherhood of Teamsters ("the Union") was being promoted throughout the time span with which this case is concerned, and there was a possibility of a strike. In June 1978 handbilling began; in September the Warrens joined the Union and participated in efforts to organize the Union at the Stokes County Plant (e.g., wearing Union T-shirts and hats to work, passing out cards, and handbilling). An election was held in December 1978, and the Union was elected to represent the employees. After the plaintiffs were terminated from employment, August 1979 to April 1980, Halstead went through a protracted strike.
 
 
 6
 Few other facts are undisputed. Rather, the balance of the allegations are found in the two parties' conflicting statements. The plaintiffs allege a pattern of company actions constituting discrimination in promotion and racial harassment. The Warrens claim that ultimately they were discharged from employment when they, along with other employees, sought to meet with management and later filed charges with the Equal Employment Opportunity Commission ("the EEOC").
 
 
 7
 The Warrens claim that their probationary work records were good.[2] Both brothers were hired as utility laborers. Alfred was assigned to a bench helper's position during his probationary period; at the end of the time, he was designated a bench operator. At the time Alvin was hired he worked as an operator for about three weeks; he was removed from that job while still on probation. Jimmy Gann, a white employee, was then assigned to Alvin's position. It is undisputed that the brothers did not receive write-ups and faced no major personnel problems until the fall of 1978 when they allegedly were passed over in promotion in favor of two white employees with less seniority.
 
 
 8
 Plaintiffs assert that in September 1978 a vacancy occurred for the position of leadman in their production department. Although Halstead's policy had been to grant a promotion based on departmental seniority, the Warrens contend that on September 11, 1978 white employee Greg Smothers was promoted to leadman with less seniority than plaintiffs. Further, they assert that on October 11 Gann was also so promoted. (Later, on December 18 Stephen Boles was also allegedly promoted to leadman out of seniority sequence.) The company insists that these promotions were in accordance with seniority.
 
 
 9
 Seeking to raise a grievance following these first two promotion decisions, plaintiffs and other black employees sought a meeting with Personnel Manager Allen on October 12. Allen allegedly said to them: "Get the hell back to work or punch the damn clock." Allen denies talking with the plaintiffs about problems regarding discrimination against blacks being promoted on this or any other date up to January 17, 1979. (Vol. VI, p. 133.) Following that attempted meeting, plaintiffs assert, a pattern of daily retaliation was put into effect by immediate foreman Larry Sands, the recently promoted Gann, and Smothers.
 
 
 10
 Specifically, these complained-of retaliatory acts consisted of "getting in the way of plaintiffs being able to get out production." The acts reportedly included "hollering from twelve inches away" in the plaintiffs' faces and rubbing plaintiffs' buttocks with hands or sexual organs. The white supervisors allegedly stood between the plaintiffs' machines and control panels to hinder their work production. Both plaintiffs testified that they felt humiliated, like a "piece of meat." At the same time that these retaliatory acts were reportedly being committed, the white supervisors were admonishing the plaintiffs to "cooperate." The Warrens contend that Sands and Smothers did not engage in this type of behavior toward white employees.
 
 
 11
 Plaintiffs also claim that numerous racial comments were made to black employees. Alfred alleges, for instance, that at the time he received a three-day suspension, Personnel Manager Allen told him that "this country should be like it is in South Africa, that the white man should be ruler, that the black man didn't have enough intelligence to have a leadership position." Similarly, Alvin Warren contends that Allen told him that the "white man was always going to be superior to the black because of money." Allen acknowledges talking to Alvin about South Africa, but denies that it was in a discriminatory manner.
 
 
 12
 To counteract the harassment, plaintiffs allege, they sought, along with other black employees, to meet with Plant Manager Terlinden on December 19 and 20, 1978. Both groups working on two different shifts were allegedly made to wait for thirty minutes and then told to return to work without having made any arrangements to talk to Terlinden. It is undisputed that Alvin received a "first warning" because of "lack of cooperation" on December 20, 1978, and Alfred received a "first warning" on December 19, 1978 citing "walked off job without permission." (Vol. II, pp. 45, 53.)
 
 
 13
 Following the attempted meeting with Terlinden, plaintiffs testified the write-ups and disciplinary measures escalated; Alvin claims he no longer took breaks and recruited a fellow employee to bring lunch to his machine. It is undisputed that beginning on the date of the attempted meeting with Terlinden Alvin's supervisors began keeping notes on cards documenting plaintiff's "lack of cooperation." These cards were never shown to the plaintiff, nor were the notes kept on any white employee in B-Bay other than Perry Kendrick, who accompanied plaintiffs and black employees when they sought to complain to Terlinden. Halstead characterizes the cards as a normal plant practice.
 
 
 14
 On January 15, 1979 both plaintiffs filed charges of racial discrimination with the EEOC in Charlotte, North Carolina; six other black employees filed the same charges. The plaintiffs further allege that after they filed the charges the retaliatory behavior increased. Alvin testified that while he was training Gary Galloway, a white employee came at him from behind and hit him on the head with a copper tube. Alvin contends that even though Bill McClain, an area supervisor, was standing nearby, McClain "just turned his head away." Halstead's "Accident Investigation Report" of January 4, 1979 signed by Sands lists the circumstances as "crane moved and employee let go of tube which hit injured in head." (Vol. II, p. 86.)
 
 
 15
 Alvin further alleges that the reason he was unable to begin work on time the morning of December 20 was that his toolbox had been demolished and he had to locate another. Every day thereafter, he alleges, his tools were hidden, and although he complained to Allen, no action was taken. The company characterized the tools as "lost."
 
 
 16
 On January 22, 1979 Alfred was terminated for excessive absenteeism. On February 2, 1979 Alvin was terminated for failure to cooperate. Plaintiffs allege that all of the other black employees who filed EEOC charges were also thereafter terminated (specifically, Ronnie Anderson, James Eckerd, Steven Golden, Robert Martin, William Dalton, and Joe McClinton). They further allege that one of the four employees involved in the December attempted meeting--white employee Kendrick--was also fired.
 
 
 17
 On February 1, 1982 the Warrens filed a complaint in the United States District Court for the Middle District of North Carolina. First, they alleged that the Union had breached its duty of fair representation by not perfecting an appeal on the grievance dismissed by the National Labor Relations Board. Second, they claimed that defendants had violated the Civil Rights Act of 1866, 42 U.S.C. Sec. 1981 ("section 1981") and Title VII of the Civil Rights Act of 1964 ("Title VII") in various respects.
 
 
 18
 On October 21, 1983 the district court granted in part and denied in part defendant's motion for summary judgment. The court dismissed all claims by Alfred under section 1981, the claim by Alvin under section 1981 for racial harassment, and both plaintiffs' Title VII claims for racial harassment, threats, and discharge from employment because of race. The court therefore limited the case to the following issues:
 
 
 19
 (1) Was plaintiff Alvin discharged because of his race in violation of section 1981;
 
 
 20
 (2) Was plaintiff Alvin discharged in retaliation for filing administrative charges of racial discrimination with the EEOC or for complaining to management about racial discrimination in violation of section 1981;
 
 
 21
 (3) Were both plaintiffs discharged in retaliation for filing administrative charges of racial discrimination with the EEOC or for complaining to management about racial discrimination in violation of Title VII; and
 
 
 22
 (4) Did the defendant fail to promote both plaintiffs to various leadmen positions because of race in violation of Title VII?
 
 
 23
 On April 26, 1985, after a five-day bench trial, the district judge entered judgment in favor of the defendant and dismissed the cause with prejudice. Plaintiffs now appeal.
 
 II
 
 24
 This case is made difficult and troubling because of the wide disparity in the factual stories that the two parties bring to the court. On one hand, the employee-plaintiffs raise allegations of actions by Halstead which amount to serious--indeed, outrageous--conduct, if true. On the other hand, Halstead flatly denies virtually all that alleged conduct and admits only to the discharge of the Warren brothers, for which it offers a nondiscriminatory rationale. This is not a typical case where a defendant admits a challenged practice but disputes any inferences of discriminatory intent arising from it. See Sledge v. J.P. Stevens & Co., Inc., 585 F.2d 625, 634 (4th Cir.1978). Given this situation, in which the factfinder must decide between two conflicting versions of the relevant events, it is inevitable that the decision of the district court rested upon its evaluation of credibility.
 
 
 25
 Further complicating this case is the fact that plaintiffs' claims under section 1981 and Title VII for racial harassment and threats were dismissed on defendant's motion for partial summary judgment before the trial began. Because these claims were dismissed at an early stage, the court's decision does not speak directly to them, although a goodly amount of evidence as to the allegations was presented during the trial. With regard to the issues that were considered at trial, the district court discounted key testimony by the plaintiffs concerning events alleged to have occurred, finding it inconsistent and incredible. The findings of fact in the district court's opinion accept the defendant's denial of events.
 
 
 26
 Our role in addressing plaintiffs' arguments and reviewing the district court's findings of fact is a necessarily limited one. Under Fed.R.Civ.P. 52(a), "findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witness." Issues of intent are included in the factual matters for the trier of fact to discern. Discriminatory intent means actual motive and is not a legal presumption to be drawn from a factual showing of something less than actual motive. Thus, a court of appeals may only reverse a district court's finding on discriminatory intent if it concludes that the finding is clearly erroneous under Rule 52(a). Pullman-Standard v. Swint, 456 U.S. 273, 287-89, 102 S.Ct. 1781, 1789-90, 72 L.Ed.2d 66 (1982).
 
 
 27
 When the findings are based on determinations regarding the credibility of witnesses, Rule 52(a) demands even greater deference to the trial court's findings. Anderson v. City of Bessemer City, North Carolina, 470 U.S. 564, 565, 105 S.Ct. 1504, 1507, 84 L.Ed.2d 518 (1985). The major premise behind the deference is that such findings of fact "depend peculiarly upon the credit given to witnesses by those who see and hear them." United States v. Yellow Cab Co., 338 U.S. 338, 341, 70 S.Ct. 177, 179, 94 L.Ed. 150 (1949). Consequently, courts have been especially reluctant to resolve factual issues which depend on the credibility of witnesses. See United States v. Oregon State Medical Society, 343 U.S. 326, 332, 72 S.Ct. 690, 645, 96 L.Ed. 978 (1952).
 
 
 28
 In the situation where a trial judge's findings are based on his decision to credit the testimony of one witness versus another witness, if each has told a coherent and facially-plausible story not contradicted by extrinsic evidence, that finding is almost never clear error. City of Bessemer City, 105 S.Ct. at 1513. It is only when the reviewing court, on the entire evidence, is left with a definite and firm conviction that a mistake has been committed that an appellate court may reverse. United States v. United States Gypsum Co., 333 U.S. 364, 394-95, 68 S.Ct. 525, 541-42, 92 L.Ed. 746 (1948).
 
 
 29
 The guidelines on questions of intent and pretext that a district court must apply, and which we must review, are complex ones. Direct evidence of discriminatory intent is seldom available; indirect or circumstantial evidence can suffice to prove state of mind. United States Postal Service Board of Governors v. Aikens, 460 U.S. 711, 714, n. 3, 103 S.Ct. 1478, 1481, n. 3, 75 L.Ed.2d 403 (1983). It is that elusive state of mind that is the crux of our case, where plaintiffs have asserted a theory of Title VII liability based upon disparate treatment. Discriminatory intent is an essential element of proof for such claims because disparate treatment involves distinct actions by an employer which treat certain people less favorably than others based on their race, color, national origin, religion, or sex. International Brotherhood of Teamsters v. United States, 431 U.S. 324, 335, n. 15, 97 S.Ct. 1843, 1854, n. 15, 52 L.Ed.2d 396 (1977). The burden of persuasion as to the existence of a violation, including the element of discriminatory intent, remains on the plaintiff.
 
 
 30
 Once the plaintiff establishes a prima facie case, the defendant may dispel the presumption or inference of discriminatory conduct through evidence of nondiscriminatory reasons for its actions. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). The defendant need not persuade the court that it was actually motivated by the proffered reasons; it need only articulate--not prove--a legitimate, nondiscriminatory reason for its action. It is sufficient if the defendant's evidence raises a genuine issue of fact whether it discriminated against the plaintiff. Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 254-55, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981).
 
 
 31
 Finally, if the defendant meets its burden of presenting such a legitimate basis for its action, the plaintiff is given an opportunity to demonstrate that the "proffered justification is merely a pretext for discrimination." Furnco Construction Corp. v. Waters, 438 U.S. 567, 578, 98 S.Ct. 2943, 2950, 57 L.Ed.2d 957 (1978); Davis v. Richmond, Fredericksburg & Potomac RR, 593 F.Supp. 271, 280 (E.D.Va.1984). The burden is upon the plaintiff to prove by a preponderance of evidence that the defendant's proffered reason is not worthy of belief or that discriminatory reasons more likely motivated the defendant. Burdine, 450 U.S. at 256, 101 S.Ct. at 1095. This burden upon the plaintiff "merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination." Id.
 
 
 32
 Rarely will there be "eyewitness" testimony with regard to the employer's mental processes. Aikens, 460 U.S. at 716, 103 S.Ct. at 1482. Rather, several types of objective evidence may be potentially probative of pretext. For instance, in the promotion context, a plaintiff may attempt to produce evidence that the defendant departed from its usual business procedure, or that the procedures by which a decision was made are suspect; plaintiffs might also point to evidence that there are no fixed or reasonably objective standards and procedures for evaluating the applicant. Love v. Alabama Institute for Deaf and Blind, 613 F.Supp. 436, 438 (N.D.Ala.1984).
 
 
 33
 Evidence of a general atmosphere of discrimination may also be considered: proof of historically-limiting opportunity or harassment. Even where such past discriminatory acts are time-barred for purposes of a particular claim, the Supreme Court has stated that this type of showing "may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue." Holsey v. Armour & Co., 743 F.2d 199, 207-08 (4th Cir.1984), cert. denied, 470 U.S. 1028, 105 S.Ct. 1395, 84 L.Ed.2d 784 (1985), citing United Airlines, Inc. v. Evans, 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977). In addition, evidence of a general atmosphere of discrimination may be considered with other evidence bearing on motive in deciding whether a plaintiff has met his burden of showing that the defendant's articulated reasons are pretextual. Id.; see also Furnco, 438 U.S. at 580, 98 S.Ct. at 2951; Sweeney v. Board of Trustees of Keene State College, 604 F.2d 106, 112-13 (1st Cir.1979). Thus, evidence of racial harassment or threats, though not the subject of a distinct claim, is relevant to the determinations of intent and pretext.
 
 
 34
 Finally, statistical proof may be a tell-tale sign of pretext even if it is not dispositive of the claim in and of itself. Richmond, Fredericksburg & Potomac RR, 593 F.Supp. at 280. Statistics with regard to the defendant's employment policy and practice may be helpful to a determination whether its action in a particular case conformed to a general pattern of discrimination. McDonell Douglas, 411 U.S. at 805, 93 S.Ct. at 1825. Although statistics cannot alone prove the existence of a pattern or practice of discrimination, or even establish a prima facie case shifting to the employer the burden of rebutting the inference raised by the figures, "[s]tatistical analysis served and will continue to serve an important role" in cases in which the existence of discrimination is disputed. Teamsters v. United States, 431 U.S. 324, 339, 97 S.Ct. 1843, 1856, 52 L.Ed.2d 396 (1977) citing Mayor of Philadelphia v. Educational Equality League, 415 U.S. 605, 620, 94 S.Ct. 1323, 1333, 39 L.Ed.2d 630 (1974).
 
 
 35
 Defendant's proffered reasons must be looked at in the context of all these kinds of evidence, instead of merely standing alone. Plaintiff's initial evidence should be combined with the evidence arising from cross-examination in order to determine whether the defendant's reasons are legally sufficient or whether they should be discredited. Williams v. City of Montgomery, 550 F.Supp. 662, 667 (M.D.Ala.1982), aff'd, 742 F.2d 586 (11th Cir.1984), cert. denied, 470 U.S. 1053, 105 S.Ct. 1756, 84 L.Ed.2d 819 (1985), citing Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The trier of fact must judge whether the version of events as related by one party is internally consistent and plausible, or whether numerous inconsistencies and conflicting documentary evidence render the story unreliable. See Holsey, 743 F.2d at 207.
 
 
 36
 We turn now to applying these general principles to a specific examination of each of the promotion and termination from employment claims and to the ultimate issue of whether the district court's factual findings are supported by the legally-relevant evidence.
 
 III
 Discharge Claims
 
 37
 A few preliminary remarks are appropriate to a consideration of both plaintiffs' discharge claims. Alfred and Alvin Warren instituted their action against Halstead seeking injunctive, declaratory, and monetary relief for alleged employment discrimination. First, both plaintiffs assert claims under Title VII, 42 U.S.C. Secs. 2000e, et seq. They claim they were discharged in retaliation for filing administrative charges of racial discrimination with the EEOC or for complaining to company management about racial discrimination in promotion.
 
 
 38
 Alvin alone raises a claim under 42 U.S.C. Sec. 1981,[3] which affords a federal remedy against discrimination in private employment on the basis of race. Both Title VII and section 1981 claims are independent of each other, and the remedies available under each, although related, are separate, distinct, and independent. Johnson v. Railway Express Agency, Inc., 421 U.S. 454, 460, 95 S.Ct. 1716, 1720, 44 L.Ed.2d 295 (1975). Both claims require a proof of the same elements of a prima facie case, Gairola v. Commonwealth of Virginia Dept. of General Services, 753 F.2d 1281, 1285 (4th Cir.1985). For the purposes of this appeal, we will treat proof of the Title VII and section 1981 claims together.
 
 
 39
 Finally, it is only in discussion of Alvin's discharge claim that the district court refers to whether a prima facie case has been made out, stating that "Warren possibly established" such a case. Warren, 618 F.Supp. at 508. However, in Alfred's other discharge claim (and the promotion claims of both brothers) the district court simply goes ahead to consider the issue of pretext. We will also go through an examination of each issue, including the allegation of pretext, as though a prima facie case existed and avoid, as the district court did, prematurely cutting off our analysis.
 
 Alfred Warren's Discharge Claim
 
 40
 Halstead fired Alfred for excessive absenteeism and lateness. The district court made a finding of fact that plaintiff experienced attendance problems after completing probation and received several progressive disciplinary warnings, in accordance with Halstead's Employee Handbook.[4] Based on its findings, the district court reached its conclusion that Alfred was dismissed because he failed to satisfy his employer's reasonable expectations for attendance. Id. at 506-07.
 
 
 41
 The district court noted that Alfred's discharge followed the filing of his EEOC charge (the charge was filed on January 15, 1979 and the decision to terminate was made on January 20). Id. We note that there are also other circumstances surrounding Alfred's discharge that might suggest pretext.[5] However, even proof that individual days here and there recording Alfred Warren's absences may have been inaccurately charged against him does not overcome the evidence of the large number of absences and tardy days which remain. Alfred attempts to rebut that record by asserting that whole blocs of recorded absences were falsified because they represented "work injuries on the job."[6] These are serious allegations by the plaintiff because they go to the bulk of days listed as absences. But plaintiff does not present any kind of written evidence, such as accident reports or supervisor's notes, that he was sent home for work-related injuries and that they should not be counted as absences.
 
 
 42
 Even more basic, even if Alfred was off days with illness related to his work, he still was absent, and under Halstead's policy there is no distinction between excused and unexcused absences. The policy and practice did not require discipline after a particular number of absences. (Jt.App.Vol. VI, p. 21.) Such a loose, subjective absenteeism policy may indeed be susceptible to manipulation for a discriminatory reason. However, the burden is on the plaintiff to show that the general policy was applied in a discriminatory manner to him in particular. At Halstead all employees were subject to the same policy in that there were no unexcused absences. White employees (e.g., Powell Whitten, Vol. II, p. 48, Vol. VII, p. 82) had Workmen's Compensation days and on-the-job injuries treated as absences. The question of whether the employer's policies or decisions are harsh, unfair, or inappropriate is not at issue, absent some showing of discrimination. Payne v. Blue Bell, Inc., 550 F.Supp. 1324, 1326 (M.D.N.C.1982).
 
 
 43
 Even if discriminatory animus or retaliation is "in part" a reason for the adverse employer actions, in this circuit a more stringent standard applies and requires that the plaintiff show that he would not have been discharged "but for" the filing of the charge on the protected activity. Ross v. Communications Satellite Corp., 759 F.2d 355, 365-66 (4th Cir.1985). See also Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 243-44 (4th Cir.1982). The standard is designed to ensure that the mere fact that an employee files an EEOC charge does not immunize him from legitimate discipline for an unsatisfactory performance. EEOC v. Federal Reserve Bank of Richmond, 698 F.2d 633, 668-89 (4th Cir.1983), rev'd on other grounds sub nom. Cooper v. Federal Reserve Bank, 467 U.S. 867, 104 S.Ct. 2794, 81 L.Ed.2d 718 (1984).
 
 
 44
 In the case before us, Alfred Warren was a marginal employee with regard to his absenteeism. He received a series of warnings for poor attendance in accordance with company policy. During the time Alfred worked for Halstead, twenty-two employees were terminated for excessive absenteeism. (Jt.App. Vol. II, p. 46.) While some of these twenty-two employees were terminated with greater or fewer absences than plaintiff, Warren was treated the same as other employees under defendant's discipline practices. (Jt.App. Vol. VI, pp. 3-4.) The district court found that Alfred's attendance problems were well-documented, Warren, 613 F.Supp. at 506, and we cannot disagree.[7]
 
 
 45
 The law of this circuit is that the discharge of an employee on attendance, if properly established, is sufficient to rebut an inference of discrimination and shift the burden of production to the plaintiff in a disparate treatment case. Federal Reserve Bank, 698 F.2d at 668-69. Plaintiffs raise insufficient proof that Halstead's rationale for discharge--absenteeism--was a mere pretextual cover for its discrimination. Based on our review of the record, we conclude that the district court was not clearly erroneous in holding that Halstead discharged Alfred based on his absenteeism and not in retaliation for filing an EEOC charge or for complaining to management about racial discrimination.
 
 
 46
 We, therefore, affirm the district court's determination of Alfred Warren's discharge claim.
 
 Alvin Warren's Discharge Claim
 
 47
 Halstead fired Alvin for wasting company time and for failure to cooperate. The district court made a finding of fact that prior to his discharge, Alvin received a written warning for absenteeism on December 11, 1978, a written warning for lack of cooperation on December 20, 1978, and a written warning and three-day suspension for wasting company time on January 11, 1979. Warren was terminated February 2, 1979 in accordance with Halstead's progressive discipline system. Warren, 613 F.Supp. at 503-05.
 
 
 48
 The court did note that Alvin had "possibly" established a prima facie case of discrimination through a combination of the timing of his EEOC charge and his discharge which occurred approximately two weeks later, together with the subjective nature of many of his alleged job deficiencies. However, it concluded as a matter of law that Alvin's termination was not because of race or in retaliation for his protected activity, but for continuing the conduct for which he had been previously reprimanded. Id. at 508-09.
 
 
 49
 The court reached its conclusion after it carefully considered the plaintiffs' testimony and found it incredible--"equivocal, inconsistent, and often contradictory." Id. at 509. This was based on the court's perception of the uncertainty of plaintiffs' testimonial recall of events, as well as the court's stated conviction that "[v]irtually the only evidence that such instances [harassment] ever occurred was the testimony of the Plaintiffs themselves." Id. On the other hand, the district court found the defendant's proffered explanation worthy of credence, pointing to other black employees who were promoted and white employees who were terminated. Id. at 508. After according the district judge's better vantage point the deference we must, we are convinced that the court's credibility assessment cannot serve as a rational basis for the findings made here.
 
 
 50
 As this circuit has pointed out earlier, "[c]redibility involves more than demeanor and comprehends an overall evaluation of testimony in the light of its rationality or internal consistency and the manner in which it hangs together with other evidence." Miller v. Mercy Hosp., Inc., 720 F.2d 356, 365 (4th Cir.1983), citing 9 C. Wright & A. Miller, Federal Practice & Procedure: Civil Sec. 2586, pp. 736-37 (1971). We have carefully reviewed the voluminous record and are persuaded that a more accurate characterization of Halstead's testimony is that it reveals remarkably similar failures of recall and ambiguity--but with the added feature of multiple, serious inconsistencies between defendant's testimony concerning Alvin's discharge and the testimony of other witnesses and the documentary evidence.
 
 
 51
 To begin, there is extensive testimony by defendant's witnesses that they had no knowledge of complaints of racial discrimination by plaintiffs. Personnel Manager Allen denied on direct examination that Alvin Warren ever came to him to talk about discrimination toward black employees either in October 1978 (at the time of Smothers' and Gann's promotions), or at any time before the employees' attempted meeting with Terlinden on January 19-20 (Vol. VI, p. 127). Yet on cross-examination, Allen was forced to admit that his testimony was contradicted by company records.[8] Defendant witnesses' denial of meeting in October with black employees protesting recent promotions is contradicted by the eye-witness testimony of Golden, a former employee who was part of the group.[9]
 
 
 52
 Additionally, the testimony of the personnel manager and plant manager as to the December 19 and 20 events is directly contradictory.[10] All of defendant's witnesses have similarly denied ever taking part in or knowing of harassment directed at the Warrens, such as hollering or "butt rubbing." Yet, Golden testified not only that he was present during such harassment of the plaintiffs, but that it was also directed at him.[11] Omitting any reference to Golden's direct testimony, the court concluded that "[v]irtually the only evidence that such instances ever occurred was the testimony of the Plaintiffs themselves." The court makes Finding of Fact # 24: "Plaintiffs did not bring to the attention of management during their employment any complaints about supervisors rubbing them or trying to get them to engage in homosexual activities." Warren, 613 F.Supp. at 504-05, 508.
 
 
 53
 The decision to terminate Alvin Warren was based on the note cards documenting his "lack of cooperation" kept by Warren's immediate supervisors, Sands and McClain. The district court was concerned about this evidence,[12] and its concern about possible pretext was well-taken. Both Allen and McClain testified that keeping such cards in a file box on a foreman's desk and relying on them for discipline was routine plant policy, in fact, "mandatory." (Vol. VII, p. 116; Vol. IV, p. 43.) Yet, the plant manager characterized the practice as "not normal," but, in fact, "strictly exceptional." (Vol. III, p. 148.)
 
 
 54
 The taking of notes began with a first warning about "lack of cooperation" on December 20, 1978, the day of the attempted meeting with Terlinden. Defendant's witnesses deny any discriminatory intent, but Allen and Terlinden admit that they cannot remember any white employees that notes were kept on (Vol. VII, p. 59, Vol. III, p. 149) except Kendrick. Coincidentally, Allen remembers that Kendrick was the only white employee in the group that attempted to see Terlinden in December (Vol. VII, p. 141). In fact, McClain cannot remember another employee of any race who was terminated for lack of cooperation. (Vol. IV, p. 62.)
 
 
 55
 As to the content of the "lack of cooperation" with which Alvin was charged, the testimony shows that the term was hopelessly elastic and subjective and only served a pretextual--rather than a legitimate--company function. Allen testified that he "tried many times to explain what lack of cooperation meant" including basketball analogies. (Vol. VII, p. 54.) It is not surprising that Alvin Warren testified that he never understood what he was being written up for when we look at the formless definition Allen offers.[13] Contrast that to the narrow interpretation contained in the Employee Handbook and referred to by Terlinden.[14] Even accepting Allen's broad definition of "lack of cooperation," the information on the cards is contradictory within its own system.[15]
 
 
 56
 Briefly, we simply note other relevant evidence that also goes to raise an inference of pretext. There is the proximity of the filing of the EEOC charge on January 15, 1979 and Alvin Warren's firing on February 2, 1979, including the inconsistent testimony by company officials regarding the date they were first made aware of the charge.[16] Such close proximity can raise an inference that the discharge had a retaliatory motive. EEOC v. St. Joseph Paper Co., 557 F.Supp. 435, 442 (W.D.Tenn.1983). Finally, there is the statistical evidence presented by the plaintiffs' expert witness showing that the number of blacks discharged from Halstead in 1978 and 1979 was at a deviation rate higher than would be explained by chance, and, in fact, was in a range where an inference of discrimination is raised.[17] EEOC v. American National Bank, 652 F.2d 1176, 1192 (4th Cir.1981), cert. denied, 459 U.S. 923, 103 S.Ct. 235, 74 L.Ed.2d 186 (1982).
 
 
 57
 Having reviewed all the evidence, we are forced to the difficult conclusion that the determination of the district court on the discharge claim of Alvin Warren is clearly erroneous. The court has failed to evaluate the contradictions between the defendant's witnesses' testimony and the documentary evidence. The court has given little consideration to the timing of the note cards kept on Alvin's performance, or to the subjective content of their discipline, even though the more subjective the criteria in a defendant's proffered reason, the more difficult its task in meeting the production burden established in Burdine.[18] The white employees referred to by the district court as being discharged in a like-situation were in fact not comparable.[19]
 
 
 58
 Finally, the court has given great weight to the weaknesses of recall that plaintiffs showed at times and then characterized their testimony as inconsistent, where the record indicates primarily ambiguity, literalness.[20] There is always, of course, the possibility that protestations of inability to recall are merely "stonewalling." But where the failures of recall on one side are matched by unconceded but demonstrable failures of equal or greater magnitude on the other, it would seem a most questionable factfinding process to resolve them by forgiving one set of failures and ascribing the other to lack of credibility. Mercy Hosp., Inc., 720 F.2d at 367.
 
 
 59
 We must conclude that the court's factual findings are the result of a factfinding process that does not meet our principled standard. In holding that Alvin was not discharged for discriminatory reasons, the district court has made findings that are simply not supported by substantial evidence and fail to take into account substantial evidence to the contrary. See Moore v. City of Charlotte, North Carolina, 754 F.2d 1100, 1104 (4th Cir.), cert. denied, --- U.S. ---, 105 S.Ct. 3489, 87 L.Ed.2d 623 (1985).
 
 
 60
 We do not reach such a conviction based simply upon a perception derived from a de novo review of the record that the "actual" facts are other than those found. Our review instead focused upon the factfinding process, rather than directly on the factfinding result. Where, because of mistakes in the factfinding process, the district court's critical findings fail to be supported by the requisite preponderance of evidence, we must reject the district court's determinations regardless of the deference required by Rule 52(a). See Mercy Hosp., Inc., 720 F.2d at 361.
 
 
 61
 As this circuit said in that case:Even as we adjudge the findings here to be clearly erroneous, we must be prepared to concede--and do--that by some process this experienced, sensitive, justly respected trial judge may indeed have "found" the "true" facts. We only have the power, and the responsibility, to say that on the evidence of record he could have done so only on the basis of an intuition or insight whose probable accuracy lies beyond the capacity of an appellate court to review on any principled basis. Assessed according to legal standards of rationality in drawing inferences of motivation from raw historical facts in evidence and under controlling burdens of proof, the ultimate finding of discriminatory motivation in this case must be rejected as clearly erroneous.
 
 
 62
 Id. at 369-70.
 
 
 63
 We reverse the district court's determination on the discharge claim of Alvin Warren and remand this portion of the judgment for consideration as to relief.
 
 Promotion Claims
 
 64
 Finally, both Alfred and Alvin Warren raise claims of racial discrimination as to promotions under Title VII. Plaintiffs do not challenge the promotion policy of Halstead in general, but instead allege discriminatory treatment in the way it was applied to them. The Warrens specifically allege that white employees were promoted to leadmen over them,[21] out of the proper seniority sequence.
 
 
 65
 The district court found that the company seniority policy was set up on the basis that Halstead
 
 
 66
 [u]sed departmental seniority as the primary criterion for promoting employees to available leadmen positions. When an opening occurred, the employee with the most departmental seniority was promoted unless he was not qualified or did not want the position.
 
 
 67
 Warren, 613 F.Supp. at 502. The district court concluded, as a matter of law, that the promotions of white employees Smothers and Gann "were in accordance with company guidelines" because they had more seniority than the plaintiffs. As to Boles' promotion the court concluded that
 
 
 68
 [a]lthough Stephen Boles had approximately six weeks less seniority than the Plaintiffs, his promotion to leadman was only a temporary one for two weeks. For the court to conclude that this brief isolated occurrence is evidence of racial discrimination against the Plaintiffs requires a quantum leap which the court is unwilling to make.
 
 
 69
 Id. at 506.
 
 A. Promotion Claim as to Boles
 
 70
 We turn first to the promotion of Stephen Boles. There is no dispute among the parties that Boles was hired by Halstead on July 31, 1978, approximately six weeks after plaintiffs were hired. On December 18, 1978 Boles was promoted to a temporary leadman position in B-Bay. The factual dispute occurs at this point concerning Boles' status until March 23, 1979, when he was made a bench operator leadman. Defendant's witnesses testified that Boles returned to his bench operator's position two weeks after his temporary promotion on December 18 because his leadman and supervisor returned to work from vacation. Halstead's representatives assert that there were no leadmen vacancies in December 1978 and that Boles' upgrade was only a temporary measure to cover the one week's vacations for the regular leadman and shift foreman. (Vol. VI, pp. 146-47.)
 
 
 71
 The difficulty with the district court's acceptance of this version of events in its findings of fact as to Boles' "temporary upgrade" is that Halstead's own records contradict it. It is true that the Halstead "Personnel Policies and Procedure" manual allows temporary transfers (not to exceed one week) without regard to qualifications or seniority. (Vol. II, p. 9.) But, Boles' "temporary transfer" lasted for approximately thirteen weeks.[22]
 
 
 72
 It is not the appropriate role for a court to second-guess the evidence before it and rely on one party's contention that it "could have" brought the evidence supporting its story to the factfinder. On their face, the company records corroborate plaintiffs' claim that a white employee with six-weeks less seniority was promoted over them. Plaintiffs have thus made out a prima facie case of discrimination in promotion and successfully rebutted Halstead's proffered non-discriminatory reason that plaintiffs had less seniority. We have no choice but to find the district court's Finding of Fact # 8 and its conclusion of law based on that finding of fact to be clearly erroneous. Therefore, with regard to Boles' promotion, we reverse and remand to the district court for consideration of granting relief to the plaintiffs.
 
 B. Promotion Claim as to Smothers and Gann
 
 73
 Lastly, we consider the other two promotion claims. The district court made a finding of fact that both Smothers and Gann had greater company and departmental seniority than either plaintiff; on that basis the court concluded, as a matter of law, that the promotions were in accordance with company guidelines and did not reflect a discriminatory animus. Warren, 613 F.Supp. at 506.
 
 
 74
 The difficulty with the district court's findings is that there is conflicting testimony over several issues: the hire date for Smothers and Gann, their department seniority, whether either went back into construction work after coming into plaintiffs' department, whether plaintiffs first trained Smothers and Gann on the job, etc. (Vol. III, pp. 16-21; Vol. VI, p. 81.) In a promotion question where conflicts in testimony exist, courts usually look to company records to resolve the issue. This is reasonable because company records constitute objective evidence of hiring dates, job classifications, seniority, and pay levels; such records are precisely the type of evidence which can resolve contradictions in testimony and credibility questions.
 
 
 75
 Yet, in the case before us, careful review of the eight volumes of trial transcript and the district court's opinion does not reveal one reference to records offered into evidence by Halstead to resolve these promotion issues.[23] The evidence may appear in some part of the record which has not been available to us. We can only conclude on the basis of the record before us that the district court accepted the defendant's factual allegations regarding Gann's and Smothers' basic employment information in the absence of documentary evidence. If so, the court failed to indicate on what basis it credited defendant's testimony over plaintiffs.
 
 
 76
 The district court may very well be entirely correct in its factual findings on the promotion issue, and therefore correct in its conclusion of law resting on them. But we, as an appellate court, simply cannot conduct an adequate review based on such a record. See Lewis v. Bloomsburg Mills, Inc., 773 F.2d 561, 577-78 (4th Cir.1985). Consequently, we remand the promotion issue as to Gann and Smothers to the district court for clarification as to the evidence relied on for its determination. If relevant company records were never put into evidence, that fact should be noted and inferences drawn therefrom.
 
 
 77
 With regard to the claims concerning the promotions of Gann and Smothers, we remand the case for further clarification of the record.
 
 IV
 
 78
 For the foregoing reasons, we affirm the district court in part, reverse in part, and remand for further proceedings consistent with this opinion.
 
 
 79
 (1) As to the claim of Alfred Warren that he was discharged in retaliation for filing administrative charges of racial discrimination with the EEOC or for complaining to management about racial discrimination in violation of Title VII, we affirm the district court and hold that defendant prevails.
 
 
 80
 (2) As to the claims of Alvin Warren that he was discharged because of his race in violation of section 1981 and that he was discharged in retaliation for filing administrative charges of racial discrimination with the EEOC or for complaining to management about racial discrimination in violation of Title VII, we reverse the district court and hold that plaintiff prevails. We remand to the district court for consideration of relief.
 
 
 81
 (3) As to the claims of both Alvin and Alfred Warren that defendant failed to promote both plaintiffs to leadmen and instead promoted Stephen Boles with less seniority, we reverse the district court and hold that plaintiffs prevail. We remand to the district court for consideration of relief.
 
 
 82
 (4) Finally, as to the claims of both plaintiffs that defendant failed to promote them to leadmen and instead promoted Jimmy Gann and Greg Smothers with less seniority, we are unable to make a determination from the record as it stands. We remand to the district court for clarification.
 
 
 83
 IT IS SO ORDERED.
 
 
 
 [1]
 Defendant's interrogatory responses indicate that no black leadmen were employed in the plant in 1978 or 1979. However, Personnel Manager Clyde Allen testified that ten black men were promoted to leadmen in those years, including promotions within plaintiffs' own department. (Jt.App., Vol. V, pp. 168-69.) Plaintiffs assert that no blacks were promoted to leadmen in the production department during the relevant time period, (Vol. III, p. 13), and Plant Manager John Terlinden appears to corroborate that assertion. (Vol. V, pp. 118-20.)
 
 
 [2]
 The Warrens point to employee evaluation reports completed for Alvin on June 26, July 17, and August 9, 1978 which indicated "at least average" marks for attendance and "very good" marks for work performance. The evaluation reports for Alfred, dated for the same period, ranked him as "average" in all categories, except for an "excellent" rating for attendance. (Vol. II, p. 94.)
 
 
 [3]
 The district court dismissed all claims by Alfred Warren under section 1981 on defendant's motion for partial summary judgment
 
 
 [4]
 The court found that on December 8, 1978 Warren was given a written warning because he had been absent nine days in a three-month period and late or absent from work twelve other part days. On December 29, 1978 he received a second written warning and a three-day suspension for continued absence and lateness. Warren, 613 F.Supp. at 502
 The court found that Alfred was then absent from work on January 15, 16, and 20, 1979. A doctor's note was furnished by him dated January 16, 1979 stating that he was under doctor's care for "fatigue syndrome." The company did not consider this note to be a satisfactory medical excuse for his recent absences because the note did not state that Warren had to be out of work for any specific period of time, although Halstead did not so inform Alfred. On January 20, 1979 company officials made their decision to terminate him. Plaintiff was again absent from work on January 21, 1979; when he returned on January 22, Assistant Personnel Manager Tommy Cook met with Alfred and notified him of his termination. Id. at 502-03.
 
 
 [5]
 As examples, Alfred Warren was recorded as absent for January 20, 1979 (the day the decision to terminate him was made) (Vol. VIII, p. 123.); yet he denies he was scheduled to work on that Saturday and casts some doubt on the written statement. It was company practice to have some employees on a shift work on Saturday; other employees would be notified by a supervisor that they were not to report and would not be counted absent. Id. at 103. The policy was not a formal one: names of those scheduled by the supervisor to work might be posted, or employee simply told by a supervisor. Assistant Personnel Manager Cook admitted that he did not know if Alfred's name was posted for that day, admitted that the Cost Center sheet showing Alfred absent had a lot of scratching on it (Vol. IV, p. 47.), and admitted that he did not bring to the court any posting sheet with Warren's name. (Vol. VIII, pp. 103-04.) Personnel Manager Allen appears to acknowledge on cross-examination that the marking of Warren absent for the day was an error. (Vol. IV, p. 27.)
 Again, as to absences of January 15, 16, and 17, 1979, Allen acknowledged that he made a "bad assumption" that the doctor who gave Alfred Warren a medical excuse for fatigue syndrome would "give anybody a medical note." Allen also admitted he never told Warren that the excuse would be given "very little" weight. (Vol. IV, pp. 24-25.)
 
 
 [6]
 Halstead's company manual states that "[a]n employee who sustains an accident on the job which causes him to lose work, as confirmed by a physician, will not be penalized for his absences, provided they do not exceed sixty (60) calendar days." (Vol. I, p. 86.) Nevertheless, Alfred was charged as absent for ten days even though he was receiving Workmen's Compensation for a work-related injury (Vol. III, p. 127). Again, he was listed eight hours absent on January 6, 1979 when he claims to have begun the shift, had a work injury with a hammer, and been sent home. (Vol. IV, p. 92.) Also, Alfred claims that on numerous days he was marked as "absent" or "left early" because he suffered work-related problems (specifically, bronchial congestion from breathing copper fumes) and was sent home with the company's permission. (Vol. IV, p. 97.)
 
 
 [7]
 Alfred Warren disputes that he was late on all the dates noted on his personnel records (Vol. VII, p. 126), but presents no factual rebuttal to the time-cards
 
 
 [8]
 Allen was shown an inter-plant memorandum dated January 17, 1979 which he had signed stating: "Alvin then said the problem was that he was black. He said that blacks could not be promoted out there." (Vol. VI, p. 128.) In response to this contradiction, Allen was forced to concede: "That's the only time he made that complaint." Id. at 129
 Additionally, the notes made by Allen on February 2, 1979 (Alvin Warren's discharge date) indicate: "I have talked with Alvin on at least three times.... The fact is, that rather than being a valuable employee he is a detriment to the company.... Up to this point in Alvin's mind, we have been unfair to him because he is black." (Vol. VI, p. 131.)
 
 
 [9]
 Golden testified that the group met with Allen in October to protest racially discriminatory promotions and was told to "get the hell out." (Vol. III, p. 121.)
 
 
 [10]
 Allen testified that when Alfred Warren and his group came to talk to Terlinden, Allen went up to tell Terlinden that the employees wanted to see him (Vol. IV, p. 15). McClain confirms this (Vol. VIII, p. 15). Terlinden flatly denies that Allen reported this to him. (Vol. III, p. 155)
 
 
 [11]
 Golden testified that after the black employees in his group complained to Allen in October 1978 about discrimination in promotions, Smothers, Gann, and other supervisors would stand in front of him on his machine to hinder him from getting out production, holler at him right in his face, and brush up against his behind or put their hands on his behind. He related that the same actions were taken against Alfred Warren, while he was working as his helper. (Vol. III, pp. 123-26.) Golden testified that he, as well as Alfred, was falsely accused of overstaying his breaks or remaining for too long a period in the washroom following their complaints about discrimination. (Vol. III, p. 128.) Golden further testified that Smothers and Gann told him they were glad when Alfred Warren was terminated. (Vol. III, p. 130.)
 
 
 [12]
 The court commented:
 Because of the subjective nature of the alleged infractions, the documentary proof introduced by the Defendant does not establish infractions of company rules with the same clarity as the records of Alfred Warren's absenteeism. In addition, the written notations made by Alvin Warren's supervisors as to the instances of wasting time, while not unprecedented, were not the type of records routinely kept on all employees in B-Bay of the production department. Therefore, the court must consider carefully the possibility that Defendant singled out Alvin Warren and proceeded to "build a record" to justify his discharge. Furthermore, there is no question but that by February 2 the Defendant had knowledge of the January 15, EEOC charges filed by both Plaintiffs. Alvin Warren's complaints to management about promotions and his treatment by supervisors are also uncontradicted.
 Warren, 613 F.Supp. at 508.
 
 
 [13]
 Allen explained lack of cooperation as meaning everything from attendance problems (Vol. VII, p. 57), to having a headache or being ill on the job (Vol. IV, p. 37), to failing to change-over a machine or follow job instructions (but he could not remember any instance when Alvin failed to do that). (Vol. IV, pp. 39-40.) As Allen commented, "it is just a discretionary concept." (Vol. IV, p. 41.)
 
 
 [14]
 Terlinden interpreted "lack of cooperation" to mean that when a supervisor gives an employee an instruction to do something on the job, the employee is supposed to do it. (Vol. III, p. 153.) Terlinden stated that "if an employee is getting the work out there would be no problem with lack of cooperation." Id
 
 
 [15]
 Write-up on December 20, 1978 for Alvin Warren (date of attempted meeting with Terlinden at the beginning of the shift): "Lack of cooperation with foreman, did not start to work until 11:20 hours, went to bathroom 1:00 o'clock p.m. to 1:10 p.m." (Vol. IV, p. 67.) Even Smothers, who used a stop-watch to time breaks, had to admit that a ten-minute break was acceptable. (Vol. IV, p. 65; Vol. VIII, p. 24.) Lower level supervisor Gann was not even aware that there was a rule as to how long an employee could remain in the washroom. (Vol. IV, p. 75.)
 
 
 [16]
 At deposition, the personnel manager could not recall when he received a copy of the charge filed on January 15. Yet, at trial, Allen testified that he was sure he received it on January 23, according to his notes (placing receipt after Alfred Warren's termination). (Vol. VII, p. 24). McClain thought he had become aware of the charge on the "18th, 19th, 20th of January," but settled on "the end of January." (Vol. IV, p. 53.)
 
 
 [17]
 The standard deviation for comparison of discharge of black and white employees at Halstead in 1978 was 9.08 and in 1979 was 8.18, where a standard deviation greater than two or three necessarily excludes "chance" as the cause of under representation. Halstead argued that these statistics were flawed, being based on a "snapshot" view of discharges versus a yearly total. However, the statistics are based on the figures plaintiffs were given by defendant's answers to interrogatories
 
 
 [18]
 Additionally, it is a highly suspect practice to place allegations of misconduct on poor work performance in an employee's personnel file without notice to the employee. Mays v. Williamson & Sons Janitorial Services, 591 F.Supp. 1518, 1522 (E.D.Ark.1984), aff'd, 775 F.2d 258 (8th Cir.1985)
 
 
 [19]
 The four white employees the court refers to in Finding of Fact # 21 include three probationary employees (Roger Carter, David Browning, and Robert Carter) with low ratings; Alvin Warren was not probationary and not terminable at will. The fourth employee, Vernon Carter, walked off the job, swore at a supervisor, and admitted he did not work during the morning; he was discharged for violation of three specific company rules and said he knew it was his fault. (Vol. II, pp. 61-63.) No note cards were kept on any of these white employees. (Vol. VIII, p. 7.)
 
 
 [20]
 As to literalness, at deposition Alvin denied hearing any racial slurs made by management; he defended that answer at trial, saying that what he alleged management said to him was instead "all comments, personal opinions" that "offended me" because they dealt with race. We must take into account plaintiffs' age, inexperience, and lack of familiarity with the witness stand
 
 
 [21]
 Leadmen received 16cents per hour extra pay, reported for work one-half hour earlier, and according to the Employee Handbook had certain supervisory duties, such as assigning jobs and maintaining records. (Vol. I. p. 86; Vol. II, p. 13.)
 
 
 [22]
 Personnel Manager Allen admitted on cross-examination that the Employee Service Records showed Boles continuing to receive the 16cents-hourly increase in salary as leadman from December 18, 1978 until his next change in job on March 23, 1979. Allen characterized this as a "mistake," said he could not locate the paycard because it was missing from the file, but contended that the payroll registers would substantiate his position that Boles' "reverted" to his old status after a two-week move up. However, Allen said, "he hadn't had time" to find those other records and had brought no other documents with him. Id
 
 
 [23]
 Indeed, the only company records that were offered into evidence on the promotions of Smothers and Gann were offered by plaintiffs and met by defendant's objection. Plaintiffs attempted to introduce into evidence a rate card showing the date Smothers was promoted to the bench operator leadman position, but Halstead objected on the basis that Alfred was not competent to testify about company records other than his own personnel records. The court sustained the objection. (Vol. III, pp. 14-15.) Instead, Halstead offered to stipulate as to the promotion date of Smothers and Gann. (Id. at 15, 18; Vol. V, p. 100-01.) It appears that no documentary evidence was offered by defendant on the original hire date, departments, departmental seniority, etc